UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CARMELO RIVERA, | ) | |
| Plaintiff, | ) ) ) | |
| | ) | No. 16 C 9533 |
| v. | ) ) | Judge Sara L. Ellis |
| WESTROCK SERVICES INC., | ) ) | |
| Defendant. | ) | |

# OPINION AND ORDER

After Plaintiff Carmelo Rivera twice failed to follow a safety policy, his employer, Defendant WestRock Services Inc. ("WestRock"), terminated Rivera's employment on April 25, 2016. Rivera proceeded to file this suit against WestRock, alleging WestRock violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when it terminated him. WestRock has filed a motion for summary judgment. Because Rivera has failed to demonstrate that WestRock terminated him because of his age, the Court grants WestRock's motion for summary judgment.

# BACKGROUND[1]

WestRock manufactures corrugated cardboard packaging and shipping containers. Rivera began working for one of WestRock's predecessors, Stone Container Corporation, in 1969. Over the years, the company changed ownership, becoming Smurfit-Stone Container Company, RockTenn Company, and, ultimately, WestRock in 2015. Rivera worked as a converting specialist from 1996 up to his termination in 2016, with his duties remaining the same despite the changes in ownership. As a converting specialist, Rivera's responsibilities included training employees on converting machines, promoting safety, developing training materials, and repairing and maintaining converting machines throughout WestRock's facilities. Rivera primarily worked with Flexo Folder Gluer and rotary die cutting machines, and he prided himself on knowing more about these machines than any other WestRock employee. WestRock treated Rivera as a corporate employee and did not assign him to a specific facility. He also did not belong to a collective bargaining unit from at least 2012 through 2016. Thus, Rivera was subject

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and the additional facts Rivera has included in his response to WestRock's motion for summary judgment. The Court has included in this background section only those facts that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Rivera, the non-movant.

WestRock asks the Court to strike Rivera's response, claiming it does not comply with Local Rule 56.1(b)(3)(C) in that Rivera did not provide a separate statement of additional facts using numbered paragraphs. The Court denies this request. This Court's summary judgment procedures differ from Local Rule 56.1. Instead of requiring an additional statement of facts, the Court requires the non-moving party to "include facts in its response to the motion for summary judgment that it contends are disputed," with appropriate citations. Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, http://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==; *see Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures). The moving party can then respond to any such additional facts in its reply, without the need for the separate statements of fact and responses required by Local Rule 56.1(a) and (b)(3)(C). Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice. WestRock alternatively asks for leave to respond to each fact Rivera raises in his response, *see* Doc. 46 at 2 n.1, but because WestRock should have followed the Court's procedures and done so in its reply, to the extent it did not, the Court finds WestRock forfeited any additional opportunity to do so.

to WestRock's corporate policies, procedures, and practices, without consideration of any collective bargaining agreements or facility-specific rules.

WestRock maintains policies and procedures to ensure safety in the workplace. One of these policies, the Lockout Tagout Energy Control ("LOTO") program, "provide[s] guidelines to prevent employee injuries due to the unexpected energization, startup or release of energy during the servicing and maintenance of machines and other equipment." Doc. 38 ¶ 11. Specifically, under the LOTO program, "no employee may enter or place any part of his/her body in any locations in a machine or piece of equipment where there is potential exposure to any hazardous energy sources before first controlling those energy sources," which is done by "affix[ing] a personal lockout/tagout device" on the equipment while working on it and removing that device after the employee finishes work on that equipment. *Id.* ¶¶ 16–17. No exceptions to the LOTO program exist: every WestRock employee must follow the program any time he enters an energized machine, and each employee entering a machine must personally lock and tag out (instead of relying on the fact that another employee has already placed his device on the machine). The LOTO program provides that "[f]ailure to comply with all aspects of [the] program will result in immediate disciplinary action (subject to division guidelines; facility specific policies; and collective bargain agreements) up to and including termination." *Id.* ¶ 16.

Rivera received training on the LOTO program beginning with his employment with Stone Container. Rivera estimated he performed LOTO at least 10,000 times and understood that he must use LOTO every time he entered a live machine. Rivera also provided WestRock employees with training on the need to use LOTO procedures and even appeared in a training video for these procedures.

3

Despite this, Rivera committed two LOTO violations. On March 8, 2012, while at a WestRock plant in Syracuse, New York, Rivera entered an energized die cutter machine without locking and tagging out. Rivera admits he acted against company policy but maintains it was a mistake. A supervisor at the plant reported Rivera's violation of the LOTO program to Jack Shields, a team leader at the time. Rivera's supervisor at the time, Russ Lawrimore, suspended Rivera for three days because of the LOTO violation. WestRock did not document this suspension in Rivera's personnel file, although Shields memorialized the violation in an email to Lawrimore.

Approximately four years later, on April 21, 2016, Rivera committed another LOTO violation. Rivera was at a training facility in Carol Stream, Illinois, training employees on how to set up a Flexo Folder Gluer machine. Although the folding section of the machine had been removed, the machine otherwise functioned in the same manner as in a production facility. And because the machine had power during the training, the LOTO program applied. During the training, Rivera entered the energized Flexo Folder Gluer machine without applying his own LOTO device to help a struggling training employee. Rivera had access to a key, which would have allowed him to comply with the LOTO program, and he knew he should have followed the LOTO procedures before entering the machine. Lawrimore saw that Rivera had not followed procedures and called him out of the machine to get his key. Lawrimore then told Rivera to inform his supervisor, Frederick Rossi, WestRock's Director of Converting, Capital Planning, and Execution, of the violation. Rivera admitted to Rossi that he had committed a LOTO violation and that he had received a three-day suspension for a prior violation. Rossi then reported this information to his supervisor, Steve York, the Senior Vice President of Engineering and Manufacturing Services. Rossi recommended Rivera's termination, a recommendation York

approved.² Both York and Rossi followed a practice of suspending an employee for his first breach of the LOTO program and terminating the employee for the second breach, unless some other discipline was mandated by a collective bargaining agreement or facility-specific discipline policy. No formal written account of this practice—a suspension for one violation and termination for a second—exists.

On April 25, Rivera met with Rossi and Jeannine Carr, a member of WestRock's human resources department. Rivera again admitted his LOTO violation. He then learned of his termination for committing two LOTO violations. At the time, Rivera was sixty-four years old. He had previously informed people at WestRock, including Rossi, that he intended to work until he had fifty years with the company, approximately three additional years after his termination. Carr memorialized the April 25 meeting in a memorandum, which stated that Rossi "explained to Mr. Rivera that this incident was his second offense within 3 years and, as a result, we would have to terminate him." Doc. 45 at 4. Rossi testified, however, that the reference to three years should have been four, but that regardless of the time period, "[i]t wouldn't have mattered." Doc. 38-7 at 59:3–7; *see also id.* at 21:15–25 (testifying that the discipline for a second LOTO violation, regardless of when it happened, was termination). Rivera's employment record reflects that WestRock terminated him for a rules violation.

WestRock has not filled Rivera's position of converting specialist and is not currently seeking to hire someone for that position. Other WestRock employees, in addition to the manufacturers of the machines Rivera serviced, have assumed Rivera's duties. WestRock continues to use both Flexo Folder Gluer and rotary die cutting machines, as well as the EVOL machines, to create boxes. Rossi referred to the Flexo Folder Gluer and rotary die cutting

---

² Some disagreement exists as to whether Rossi or York made the ultimate decision to terminate Rivera, but their testimony establishes that they both were involved in the decision.

machines Rivera serviced as "old antique machines," with the EVOL machines considered "state of the art." *Id.* at 65:4–14, 65:25–66:1. Rivera did not know how to operate the EVOL machines. As of January 2018, WestRock had approximately 185 Flexo Folder Gluer machines and 156 die cutter machines operating in seventy-five facilities. WestRock had only thirty EVOL machines in April 2018 and no plans to purchase more of them.

Rivera proffers as a comparator Greg Kielma, a manufacturing specialist whose main duties are to maintain and repair the Twin Box Slitter machine and teach operations and troubleshooting on that machine. Although WestRock often uses this machine in connection with the EVOL machines, they are distinct. On August 6, 2015, Kielma entered an energized machine without locking and tagging out. He injured his arm when another employee activated the machine. Kielma did not immediately communicate the incident to his supervisor, Michael Martin, and instructed another employee not to report the incident. Kielma received a four-day suspension, three of those days for the LOTO violation and one day for the failure to communicate the violation to his supervisor and instructing another employee not to report it. Both York and Rossi were involved in imposing Kielma's suspension. In a memorandum memorializing his suspension, Kielma acknowledged that if he violated the LOTO policy or any other safety policy again, he would be subject to "severe disciplinary action up to and including termination." Doc. 38-14 at 2.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

The ADEA prohibits employers from discharging employees because they are forty years old or older. 29 U.S.C. §§ 623(a), 631(a). At summary judgment, "[Rivera] must produce evidence from which a jury could infer that [his] age 'was a but-for cause of [his] termination.'" *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014) (quoting *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012), and citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). Courts previously spoke of proceeding under an indirect or direct method to establish discrimination, but the Seventh Circuit has instructed that instead of using such tests, the Court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court must determine "whether a reasonable factfinder could 'conclude that [Rivera's] proscribed factor caused the discharge.'" *Brown v. DS Servs. of Am., Inc.*, 246 F. Supp. 3d 1206, 1216 (N.D. Ill.

7

2017) (quoting *Ortiz*, 834 F.3d at 765). This does not mean, however, that the Court cannot consider the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), under which Rivera attempts to demonstrate that he has the evidence needed to survive summary judgment. *Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). The Court therefore first considers the evidence through the *McDonnell Douglas* framework and then turns to a cumulative review of the evidence to determine whether a reasonable factfinder could determine that Rivera's age caused his termination. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

**I.      *McDonnell Douglas***

*McDonnell Douglas* allows a plaintiff to establish a *prima facie* case of discrimination and then rebut a defendant's stated non-discriminatory reason for the termination. *Id.* at 225. Rivera may establish a *prima facie* case by presenting facts that (1) he belongs to a protected class, (2) he was meeting WestRock's legitimate expectations, (3) he suffered an adverse employment action, and (4) WestRock treated similarly situated, younger employees (under forty or substantially younger) more favorably.[3] *Id.* (citing *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)); *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 453–54 (7th Cir. 2009). If Rivera does this, then WestRock "must articulate a legitimate, nondiscriminatory reason" for firing Rivera, "at which point the burden shifts back" to Rivera to submit evidence

---

[3] The similarly situated prong, for purposes of an ADEA claim, has sometimes been formulated as whether the employer replaced the employee with a "substantially younger" employee. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996); *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 740 (7th Cir. 2010). But this standard only applies if Rivera can show that he was meeting WestRock's legitimate employment expectations. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600–01 (7th Cir. 2010). Moreover, using this formulation would not help Rivera's case, nor does Rivera argue it should apply, because WestRock has not hired anyone into Rivera's position.

showing WestRock's reason is pretextual. *Brown*, 246 F. Supp. 3d at 1217. The parties agree that Rivera belongs to the class protected by the ADEA and that his termination amounted to an adverse employment action. Rivera's *prima facie* case then turns on whether he was meeting WestRock's legitimate expectations and whether WestRock treated him less favorably than a similarly situated, younger employee.

Here, however, there is significant overlap between the legitimate expectations prong of Rivera's *prima facie* case and the pretext question, as WestRock asserts that it terminated Rivera because he violated the LOTO program and therefore was not meeting its legitimate job expectations. *See Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010) ("When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis."). Thus, the Court will combine its analysis of these questions and first address the fourth element of Rivera's *prima facie* case, whether he has provided evidence of similarly situated individuals.

### A. Similarly Situated Employees

Rivera argues that WestRock treated him more harshly than younger employees. To show that, Rivera must identify a younger employee who is "directly comparable . . . in all material respects." *David*, 846 F.3d at 226 (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014)). Factors to consider for this determination include "whether the similarly situated employee held the same position, had the same supervisor, was subject to the

same standards, and engaged in similar conduct." *Alexander*, 739 F.3d at 981. Rivera focuses on Kielma, who committed one LOTO violation and received a suspension for that violation.[4]

Kielma, however, cannot serve as a comparator because he did not engage in similar conduct to Rivera. While they both committed LOTO violations, Kielma only committed one such violation and received the same discipline for that violation as Rivera did for his first LOTO violation in 2012. "An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016); *see also Amrhein v. Health Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) (finding that proposed comparator was not similarly situated where she had "engaged in a single violative act, rather than the multiple incidents in [plaintiff's] employment history"). Rivera has not presented any evidence of a WestRock employee who committed two LOTO violations—the basis for his termination—and received less severe discipline for the second violation.

Rivera argues, however, that WestRock treated Kielma differently for similar conduct because Kielma's LOTO violation caused injury, making it more serious than Rivera's violations, individually or combined. But the evidence in the record does not allow the Court to draw this conclusion. According to the record, because a LOTO violation could jeopardize the safety of WestRock's workers, regardless of whether injury results, WestRock treats *any* failure to comply with the LOTO program as a violation worthy of discipline. Further, York and Rossi, the relevant decisionmakers, had a practice of treating the second violation, regardless of its severity, as grounds for termination. While Rivera might believe that his two LOTO violations do not even compare to Kielma's one violation, the Court cannot engage in such speculation to

---

[4] WestRock also argues that another employee, Jose "Alex" Romero, does not qualify as a comparator. But because Rivera does not seek to use Romero as a comparator in his response, the Court need not address whether he would qualify as one.

review WestRock's business decisions. *See Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 840 (N.D. Ill. 2017) ("As long as the employer's expectations are reasonable and the employer makes the employee aware of its expectations, the Court will not inquire into Defendants' method of conducting its business.").

WestRock subjected both Rivera and Kielma to the same employment practices, suspending them both for three days for the first LOTO violation,[5] and then terminating Rivera when he committed the second. WestRock has not terminated Kielma for a LOTO violation because, as Rivera admits, Kielma has not violated the policy again. Nothing in the record suggests that WestRock, or York and Rossi, the common decisionmakers, have applied different disciplinary treatment to Kielma than to Rivera. This means that Rivera cannot use Kielma as a valid comparator. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 920 (7th Cir. 2001) (finding proposed comparator not similarly situated where comparator only committed one of the three infractions plaintiff committed); *Slutsky v. Jacobson Cos.*, No. 1:16-cv-1073, 2017 WL 2813662, at *6 (N.D. Ill. June 29, 2017) (individual not a comparator where he committed one less violation than the plaintiff).

### B. Legitimate Expectations/Pretext

WestRock also argues that Rivera cannot demonstrate that his job performance met its legitimate expectations or that WestRock's proffered reason for his termination is a pretext for discrimination. As discussed above, the Court addresses these arguments together because they both turn on whether WestRock is being truthful about Rivera's job performance. *See Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (when the employee argues that the employer is "lying about its legitimate employment expectations in order to set up a false rationale for terminating

---

[5] Technically, WestRock suspended Kielma for an additional day, but this additional day was for Kielma's failure to report his violation and instructing a co-worker not to report it as well.

him . . . the question of whether he was meeting [the employer's] legitimate expectations merges with the question of whether [the employer's] reasons for firing [the employee] are pretextual").

To show that WestRock has proffered a pretextual reason for his termination, Rivera needs evidence that WestRock was "dishonest rather than simply foolish or unreasonable." *Schmitt v. Cent. Processing Corp.*, 675 F. App'x 615, 620 (7th Cir. 2017); *Pilditch v. Bd. of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993) ("[T]he plaintiff is left to unmask, if he can, the reasons proffered by the employer as fake."). He can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' his termination, or indirectly by showing that [WestRock's] explanations are 'unworthy of credence.'" *Senske*, 588 F.3d at 507 (citation omitted). "At the end of the day, the question is simply whether 'the same events would have transpired' if [Rivera] 'had been younger than 40 and everything else had been the same.'" *Id.* (quoting *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994)); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014).

WestRock states that it fired Rivera because he violated the LOTO program on two occasions. Rivera does not dispute that the violations occurred but instead argues that WestRock has provided shifting explanations for his termination, that no written policy provided for his termination for these LOTO violations, and that WestRock exaggerated the severity of the violations to justify Rivera's termination. But the Court does not find merit in any of these arguments, nor does the record reflect that WestRock's proffered reason for Rivera's termination was dishonest or based on discriminatory intent.

Although a Court may infer pretext from the shifting or inconsistent explanations an employer gives for a challenged employment action, *see Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013), WestRock has consistently represented that the same conduct—

Rivera's violation of the LOTO procedures—underlies Rivera's termination. Rivera seizes on trivial differences in the language WestRock used to describe the basis for his termination, claiming five different explanations: (1) the statement in the April 27, 2016 memorandum that Rivera had two LOTO violations in three years; (2) Rossi's correction to that statement during his deposition that it should have referred to four years, not three; (3) WestRock's interrogatory response that Rivera violated the LOTO policy on two occasions; (4) Rossi and York's practice of terminating an employee upon the second LOTO violation; and (5) the notation on Rivera's employment record that his employment ended because of a rules violation.[6] Although WestRock did not use the same precise language every time it explained the basis for Rivera's termination, the underlying conduct remains the same. Even the non-specific rules violation notation in Rivera's employment record encompasses his failure to follow the LOTO policy, with WestRock not having proffered any other rules violations. Therefore, the Court does not find that WestRock has provided shifting explanations for Rivera's termination. *See Schuster*, 327 F.3d at 577 ("[T]he explanations must actually be shifting and inconsistent to permit an inference of mendacity."); *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997) (finding that the use of different terminology to explain the same conduct does not demonstrate shifting or contradictory explanations); *Freitag v. Capital One Servs., LLC*, No. 15-cv-810-bbc, 2017 WL 2728442, at *8 (W.D. Wis. June 23, 2017) (rejecting inconsistent explanation claim where all the explanations "were manifestations of the same overall pattern of alleged

---

[6] Rivera also argues that WestRock has not consistently represented who made the decision to terminate Rivera. But because WestRock acknowledges that both Rossi and York played a role in the termination, with York approving of Rossi's decision as Rossi's supervisor, the Court does not find any material inconsistency to suggest WestRock is lying about its reasons for terminating Rivera. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 578–79 (7th Cir. 2003) (finding that an "allegedly changing story as to who actually participated in the decision" did not create a material question of fact as to pretext).

13

unprofessional conduct that defendant asserts was at the root of defendant's concerns and its ultimate decision to terminate plaintiff," and "merely indicate[d] differing points of emphasis").

Next, Rivera argues that the Court should find pretext because WestRock did not have a written policy to support York and Rossi's practice of terminating an employee upon his second LOTO violation. But the LOTO written policy itself indicates that a LOTO violation would "result in immediate disciplinary action . . . up to and including termination." Doc. 38 ¶ 16. And Rivera knew of this policy and the need to comply with the LOTO program or face such disciplinary action. That WestRock did not specifically set out the stages of discipline in written form does not suggest pretext, particularly where Rivera has not brought forth any evidence that York and Rossi did not follow the unwritten practice of terminating an employee under their supervision when the employee committed a second LOTO violation. *See Williams v. Airborne Express, Inc.*, 521 F.3d 765, 769 (7th Cir. 2008) ("We have never required proof of a written policy to show that an employer's decision was not a pretext for discrimination.").

Finally, Rivera claims WestRock acted pretextually because it exaggerated the severity of his LOTO violations. He seizes on the fact that WestRock did not record his first LOTO violation in his employment file. But WestRock did have a record of his first LOTO violation, in the form of an email from Shields to Lawrimore. More importantly, Rivera admitted to both violations and, as discussed above, WestRock considers every violation of the LOTO program equally severe. Although Rivera may believe that WestRock applied discipline unevenly and that his actions did not warrant termination, the Court does not sit as a "super personnel department that second-guesses employer's business judgments." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted); *Widmar*, 772 F.3d at 464 ("This court has repeatedly stated that it is not a super-personnel department that

second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair."). Because no evidence exists to question WestRock's decision to terminate Rivera for failing to follow the LOTO procedures on two occasions, Rivera cannot establish that he met WestRock's legitimate expectations or that WestRock's reason for terminating him amounts to pretext. Therefore, Rivera's ADEA claim fails under *McDonnell Douglas*.

## II. Cumulative Assessment of the Evidence

"A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether 'a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge[.]'" *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 665–66 (N.D. Ill. 2016) (alteration in original) (quoting *Ortiz*, 834 F.3d at 765). The Court must also weigh whether Rivera's evidence would cause "a reasonable factfinder to determine" that his age caused his termination. *Aberman v. Bd. of Educ. of City of Chicago*, No. 12-cv-10181, 2017 WL 1036487, at *10, 13 (N.D. Ill. Mar. 17, 2017) (after addressing *McDonnell Douglas* test, also cumulatively assessing "all the evidence" to determine if the plaintiff could prove a case of age and disability discrimination at trial). "[A]ssessing cumulatively all the record evidence without the assistance of the *McDonnell Douglas* paradigm," *David*, 846 F.3d at 227, a reasonable jury could not conclude that WestRock terminated Rivera because of his age.

Rivera highlights the fact that both Rossi and York preferred the EVOL machines, with Rossi having described the machines on which Rivera worked as "old antique machines." Doc. 38-7 at 65:25–66:1. But WestRock continues to use many more of the machines Rivera serviced than the EVOL machines, with no current plans to acquire more EVOL machines. This suggests

that WestRock could still have use for Rivera's knowledge related to these machines had he not engaged in conduct warranting termination. And while Rossi had not trained Rivera on the EVOL machines, no such need existed at the time for the same reason, because WestRock continued to use the machines with which Rivera had familiarity. Rivera claims that no one at WestRock is currently being trained on the machines he serviced, but this misstates Rossi's testimony. Rossi indicated only that he was not training anyone on those machines, but others in the company and the representatives of the machine manufacturers were doing so.

Rivera also raises the fact that he had informed Rossi that he wanted to retire when he reached fifty years of service with WestRock and its predecessors, meaning approximately three years from the time he lost his job. But the Seventh Circuit has recently noted one "cannot equate retirement eligibility with age." *David*, 846 F.3d at 229. And even "requests that an employee retire are not necessarily a reference to the employee's age." *Halloway v. Milwaukee County*, 180 F.3d 820, 825 (7th Cir. 1999). Aside from the retirement remark he made himself, Rivera has not pointed to any remarks about his age or ability to retire by anyone at WestRock. Because no such other evidence exists, the Court cannot draw an inference that WestRock terminated him because of his age. *See id.* at 825 n.5.

Having considered all the record evidence, the Court cannot conclude that Rivera's age was the but-for cause of his termination. *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010) ("To establish a violation of the ADEA, an employee must show that age actually motivated the adverse employment action. Put differently, age must have played a role in the employer's decision-making process and had a determinative influence on the outcome." (citation omitted)). Instead, the evidence demonstrates that WestRock terminated Rivera

16

because of his two violations of the LOTO program, violations to which Rivera admitted.

Therefore, the Court grants summary judgment for WestRock.

## CONCLUSION

For the foregoing reasons, the Court grants WestRock's motion for summary judgment [37]. The Court enters judgment for WestRock on Rivera's complaint and terminates this case.

Dated: December 12, 2018

_____
SARA L. ELLIS
United States District Judge